UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| EDUARDO GUZMAN,<br><br>       Plaintiff,<br><br>v.<br><br>CAROLYN COLVIN, Acting Commissioner of Social Security,<br><br>       Defendant. | Civ. No. 15-6564 (KM)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

  Eduardo Guzman brings this action pursuant to 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. I do not minimize the challenges faced by Mr. Guzman; he suffers from schizophrenia, paranoid type, an impairment that is serious and real. There is substantial evidence in the record, however, that Mr. Guzman's symptoms are controlled by medication to the extent that he retains the ability to perform the functions of low-pressure jobs that exist in the national economy. The applicable standard of review therefore requires me to defer to the ALJ's weighing of the evidence. For the reasons set forth below, the decision of the Administrative Law Judge ("ALJ") is AFFIRMED.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

  Guzman has been diagnosed with paranoid schizophrenia, which causes him to experience auditory and visual hallucinations.[1] (R. 895-897, 37, 41) Those hallucinations began at some time during 2002-04, while Guzman was stationed in Korea during a tour with the U.S. Army. (R. 895-897, 291) In August 2007, at the age of 28, he received a medical discharge from the service

---

[1] Pages in the administrative record (ECF no. 10) are cited as "R. __."

1

for psychiatric reasons. (R. 43, 187, 291, 895-97)[2] Guzman has not looked for work since June 2, 2007, the date on which he alleges the onset of disability. (R. 37, 174). He takes medication for his condition and regularly visits Veteran Affairs doctors. (R. 51-52)

Guzman applied for DIB on November 29, 2011. (R. 18) His application was initially denied on February 6, 2012 and then on reconsideration on June 22, 2012. (R. 67-77, 79-88) On February 21, 2014, following a hearing at which Guzman testified and was represented by counsel, ALJ Elias Feuer found that Guzman was not under a disability as defined in the Social Security Act from any time from June 2, 2007 through December 31, 2012, the date last insured. (R. 26) On July 1, 2015, the Appeals Council denied also his request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1) Guzman now appeals that decision.

## II. DISCUSSION

To qualify for Title II DIB benefits, a claimant must meet the insured status requirements of 42 U.S.C. § 423(c). He must also show that he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted (or can be expected to last) for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A).

### A. Standard of Review

This Court exercises a plenary review of all legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). This Court adheres to the ALJ's findings so long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where

---

[2] Guzman testified that the Veteran's Administration, from which he receives over $3,000 a month in disability pension benefits, has determined that he is 100% disabled. (R. 36) Despite ALJ Feuer's request that Guzman supplement the record with information about the Veteran's Administration's disability determination (R. 65), the record does not appear to contain any information detailing the Veteran Administration's reasons for its determination of Guzman's disability.

2

facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation marks and citation omitted). Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted).

> [I]n evaluating whether substantial evidence supports the ALJ's findings ... leniency should be shown in establishing the claimant's disability, and ... the Secretary's responsibility to rebut it should be strictly construed. Due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a typical suit in a court of record where the adversary system prevails.

*Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal citations and quotations omitted). When there is substantial evidence to support the ALJ's factual findings, however, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)); *Zirnsak*, 777 F.3d at 610–11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder.").

This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Secretary's decision, or it may remand the matter to the Secretary for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

Outright reversal with an award of benefits is appropriate only when a fully developed administrative record substantial evidence which, on the whole, establishes that the claimant is disabled and entitled to benefits. *Podedworny*, 745 F.2d at 221-222; *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000); *see also Bantleon v. Comm'r of Soc. Sec.*, 2010 WL 2802266, at \*13 (D.N.J. July 15, 2010).

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five step inquiry. *See Podedworny*, 745 F.2d at 221–22. Remand is also proper

3

if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119–20 (3d Cir. 2000); *Leech v. Barnhart*, 111 Fed. App'x 652, 658 (3d Cir. 2004) ("We will not accept the ALJ's conclusion that Leech was not disabled during the relevant period, where his decision contains significant contradictions and is therefore unreliable.").

It is also proper to remand where the ALJ's findings are not the product of a complete review which "'explicitly' weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994).

### B. The Five-Step Analysis

Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. Review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulations.

**Step 1:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, move to step two.

**Step 2:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, move to step three.

**Step 3:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A. (Those Part A criteria are purposely set at a high level, to identify clear cases of disability without further analysis.) If so, the claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**Step 4:** Determine whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If not, move to step five.

**Step 5:** At this point, the burden shifts to the SSA to demonstrate that the claimant, considering her age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

### C.    The ALJ's Decision

ALJ Feuer determined that Guzman's date last insured (*see* https://secure.ssa.gov/poms.nsf/lnx/0425501320) was December 31, 2012, and that the alleged disability onset date was June 2, 2007. (R. 20) The ALJ further determined that Guzman was not under a disability, as defined in the Social Security Act, at any time during that period. (R. 25) The ALJ's specific determinations may be summarized as follows.

#### 1.    Step One

The ALJ found that Guzman had not engaged in substantial gainful activity between June 2, 2007 through December 31, 2012. (R. 20)

#### 2.    Step Two

The ALJ identified Guzman's paranoid schizophrenia as a severe impairment.[3] (*Id.*)

#### 3.    Step Three

The ALJ determined that Guzman's paranoid schizophrenia did not meet or medically equal the severity of the listed impairments, 20 C.F.R. Pt.

---

[3]    Guzman reports that he is also troubled by asthma, plantar fasciitis, and lower back pain. (Pl.'s Br. 22-26) But Guzman does not contend that he is disabled by any of these conditions. Indeed, the ALJ found that Guzman's asthma—the only other disabling condition besides paranoid schizophrenia argued before ALJ Feuer—was not severe, and he does not challenge that finding here. (R. 20, 24)

404, Subpt. P, App.1, Pt. A § 12.03 (hereinafter, "Listing 12.03").[4] Specifically, the ALJ found that Guzman failed to demonstrate that his mental impairments

---

[4] Listing 12.03 provides:

*Schizophrenic, Paranoid and Other Psychotic Disorders:* Characterized by the onset of psychotic features with deterioration from a previous level of functioning. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one or more of the following:
 1. Delusions or hallucinations; or
 2. Catatonic or other grossly disorganized behavior; or
 3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
  a. Blunt affect; or
  b. Flat affect; or
  c. Inappropriate affect;
or
 4. Emotional withdrawal and/or isolation;

AND

B.  Resulting in at least two of the following:
 1. Marked restriction of activities of daily living; or
 2. Marked difficulties in maintaining social functioning; or
 3. Marked difficulties in maintaining concentration, persistence, or pace; or
 4. Repeated episodes of decompensation, each of extended duration;

OR

C.  Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
 1. Repeated episodes of decompensation, each of extended duration; or
 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

6

satisfied at least two of the following "paragraph B" criteria: (1) a marked[5] limitation of daily living activities;[6] (2) a marked restriction in social functioning;[7] (3) a marked restriction in maintaining concentration, persistence, or pace;[8] or (4) repeated episodes of decompensation, each of extended duration.[9] (R. 21) To the contrary, the ALJ found that Guzman's schizophrenia resulted in no episodes of decompensation of extended duration and only mild or moderate restrictions or limitations in daily living activities, social functioning, or concentration, persistence, or pace. (*Id.*)

The ALJ supported these determinations with specific findings based on Guzman's testimony and evidence in the record. Guzman's daily living activities, the ALJ found, included going to the gym, caring for pets, preparing

---

[5] A marked degree of limitation is more than moderate but less than extreme. 20 C.F.R. Pt. 404, Subpt. P, App.1, Pt. A § 12.00(C).

[6] Among other activities, activities of daily living include cleaning, shopping, cooking, taking public transportation, paying bills, caring for personal hygiene and grooming, and maintaining a residence. *Id.* at § 12.00(C)(1). In order to have a marked limitation, an applicant should have "serious difficulty performing [activities of daily living] without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." *Id.*

[7] In general, an applicant's capacity to maintain of social functioning is indicated by their ability "get along with others." *Id.* at § 12.00(C)(2). In a work environment, this includes an applicant's ability to respond appropriately to authority figures and cooperate with coworkers. *Id.* In any case, an applicant may have a marked limitation in social functioning if she is "highly antagonistic, uncooperative, or hostile". *Id.*

[8] An applicant's capacity to maintain concentration, persistence, or pace is demonstrated by their ability to sufficiently focus and timely complete workplace tasks. Determining whether an applicant has marked limitations of concentration, persistence, or pace requires something of a gestalt analysis (*e.g.*, consideration of the task's complexity and objectives, its supervision and assistance, the production standards by which completion of the task is judged, etc.) that is best informed by actual limitations observed or reported in work settings, but such limitations may be reflected in other settings or observed in a clinical or psychological examination. *Id.* at § 12.00(C)(3). An applicant may have a marked limitation in concentration, persistence, or pace if she cannot complete tasks "without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistence pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions." *Id.*

[9] A "repeated episode of decompensation of extended duration" means three episodes in a year, or an average of once every four months, each lasting for at least two weeks. *Id.* at § 12.00(C)(4).

7

meals, and attending to personal hygiene and grooming. (R. 21) While he needs motivation, Guzman cleans and does his own laundry and ironing. (*Id.*) Guzman is able to leave his home, drive a car, and shop for food, clothes and other necessities by himself. (*Id.*)

With respect to Guzman's social functioning abilities, the ALJ found that Guzman seldom interacts with friends but frequents a gym and a church (*Id.*), although he does so only when there are not too many people around because he feels anxious in crowds. (R. 54, 56, 223)[10] Guzman has a girlfriend whose children he plays with and to whom he reads every night.[11] (R. 21, 58) Guzman reported, and the ALJ noted, that he respects authority figures. (R. 21, 225)

Although Guzman testified that he finds it difficult to distinguish reality from his hallucinations about three times a week, the ALJ found that his ability to maintain concentration, persistence, or pace is demonstrated by his ability to follow written and spoken instructions, read to his girlfriend's children, handle household bills, and focus for at least two hours while he plays video games. (R. 21, 61-62)

Guzman was hospitalized only twice (in June 2008 and February 2010) and never for a period longer than 11 days. (R. 290-92, 286) The first resulted from noncompliance with medication; the second after he choked his wife when she attempted to wake him up. (*Id.*) The ALJ concluded that Guzman experienced no episode of decompensation for an extended duration. (R. 21)

After thorough review of Mr. Guzman's testimony and the record as a whole, the ALJ concluded that the evidence failed to satisfy the "paragraph B" criteria "because the claimant's mental impairment did not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of

---

[10] To that end, Guzman testified that he worries others might treat him like "some type of threat" and that he might "lash out in defense mode", but hadn't done so in the 18 months prior to December 31, 2012. (R. 57)

[11] Guzman testified that he sometimes finds it difficult to differentiate his voice from auditory hallucinations when he reads to himself. (R. 58-59).

decompensation, each of extended duration." (R. 21) The ALJ concluded that the evidence also "failed to establish the presence of the 'paragraph C' criteria". (*Id.*)

Before proceeding to step four, the ALJ determined Guzman's residual functional capacity:

> **5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to occasional contact with coworkers and the public and is limited to simple, routine repetitive tasks.**

(R. 22)

Here, too, the ALJ based his determination a thorough review of the evidence in the record.

ALJ Feuer determined that Guzman suffers from paranoid schizophrenia. (R. 22) Although Guzman treats his condition with medication and psychotherapy, the ALJ noted that Guzman can be distracted by "mumbling" voices, which, when intelligible, he understands to mock and demean him. (*Id.*; *see also* 39, 55-56, 350, 369, 1116)

The ALJ determined that Guzman's symptoms were not inconsistent with the medically determinable impairments, but did not fully credit Guzman's statements about the intensity, persistence, and limiting effects of his condition.

Based on a review of Guzman's treatment records, the ALJ found that medication has stabilized Guzman's condition. (R. 22-24, *see also, e.g.,* 327, 472, 569-570, 1249, 1678) As noted above, Guzman experienced only two instances of decompensation during the five years and six months that comprise the relevant time period, the last of which occurred in 2010. (R. 23) Especially (but not exclusively) since then, Guzman's treatment records indicate that he could, and did, manage the symptoms of his condition; indeed, as the ALJ found, the "mumblings" Guzman hears are not so-called command

hallucinations; that is, Guzman reports that he can ignore or otherwise manage them. (R. 22-23, 346, 375, 382, 481, 845)

After considering the objective medical evidence and Guzman's testimony, the ALJ gave great weight to the opinions of the state's medical consultants. Robert Starace, Ph.D., found that Guzman has moderate limitations in social functioning and the maintenance of concentration, persistence or pace, no restrictions of activities of daily living, and no episodes of decompensations of an extended duration. (R. 24-25; 71) He determined that the medical evidence demonstrated that Guzman has substantial work capability for jobs in the national economy at all skill and physical demand levels. (R. 75-76) Noting that Guzman did not claim that his condition had worsened, Ellen Gara, Ph.D., reexamined the evidence and affirmed the opinions of Starace. (R. 25, 82, 86-87)

On this record, in a balanced ruling, the ALJ found that Guzman's moderate social functioning and concentration limitations were real, but not disabling. In ALJ Feuer's words:

> Based on the entire record, the undersigned concludes that the evidence fails to support the claimant's assertions of total disability. Despite evidence demonstrating that the claimant has suffered from a medically determinable "severe" impairment, the evidence also establishes that the claimant retains the capacity to function adequately to perform many basic activities associated with work. Although the claimant suffers some limitation due to impairments, and as a result, his capacity to perform work is affected, the undersigned finds that the claimant retains the residual functional capacity to perform a full range of work activity at all exertional levels but with the above outlined nonexertional limitations.

(R. 24) (internal citations omitted)

### 4. Step Four

Based on the testimony of a vocational expert, the ALJ found that Mr. Guzman, within his RFC restrictions, was capable of performing past relevant work as a warehouse worker. (R. 25, 62-63)

### D. Analysis

Guzman argues that the ALJ's Step Three analysis is infected by three errors: (1) the ALJ failed to adequately discuss why Guzman's impairments failed to satisfy "paragraph C" of Listing 12.03; (2) the ALJ erred in finding that Mr. Guzman's impairments failed to satisfy "paragraph B" of Listing 12.03; and (3) the ALJ failed to account for all of the evidence in the record when determining Guzman's residual functional capacity.

#### 1. Failure to Discuss "Paragraph C" Criteria

Guzman first faults the ALJ for failing to "fully state the reasons" why his condition is not a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (Pl.'s Br. 32, 37) That standard is seemingly intended to cover a mental condition that, while not currently resulting in decompensation, is fragile.

The ALJ's discussion of this issue is concededly terse: "The undersigned has also considered whether the 'paragraph C' criteria were satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria." (R. 21) However, the ALJ need not "use particular language or adhere to a particular format in conducting his analysis" but rather provide "sufficient development of the record and explanation of findings to permit meaningful review". *Jones*, 364 F.3d at 505. I find the ALJ here discharged that responsibility and that his determination is supported by substantial evidence.

Considering the ALJ's decision as a whole, it is clear that the ALJ found the objective medical evidence and Guzman's testimony concerning his impairments insufficient to establish that even a minimal increase mental

11

demands or change in environment would cause Guzman to decompensate.[12] As noted above, the ALJ assessed Guzman's impairments under "paragraph B" and determined—with specific findings based on Guzman's testimony and treatment records—that his impairments did not meet or medically equal the severity of that paragraph of Listing 12.03.

Without conflating what are separate issues, I consider the evidence that the ALJ developed in connection with "paragraph B" and Guzman's residual functional capacity. (R. 22-25) I will not require that an ALJ mechanically repeat the same facts and evidence under each topic heading of the opinion, as long as the findings, and the ALJ's application of them to the regulatory criteria, are clear. This is such a case.

ALJ Feuer found that Guzman considered taking college courses, navigated a divorce, and began a third romantic relationship after ending a second relationship with a woman he had met while traveling in Puerto Rico, and had considered moving in with her, although he ultimately rejected the idea. (R. 23, 53, 325-326, 841, 844-46, 1670) The ALJ considered Guzman's testimony that he has never heard voices while driving a car, and is able to play a video game for at least two hours or until he feels hungry. (R. 23, 56-57, 62) The ALJ noted that Mr. Guzman reported he was able to manage his symptoms by keeping busy. (R. 23, 1519) All of these findings, the ALJ concluded, were consistent with the determinations of the state's medical consultants that Mr. Guzman can "understand, remember and execute routine instructions [and] tasks; can sustain concentration, pace, persistence; and socially interact and adapt to changes." (R. 24-25)

---

[12] The ALJ's relatively brief treatment of the "paragraph C" criteria is understandable given the apparent insignificance of the issue to Guzman: although the state's medical consultants determined that the "evidence does not establish the presence of the 'C' criteria" at both the initial and reconsideration levels of review (R. 71, 83), Guzman did not cite the "paragraph C" criteria or argue that they were not met in either his pre-hearing memorandum to the ALJ or letter memorandum to the Appeals Council. (R. 250, R. 266)

The ALJ's rejection of the conclusion that even a minimal increase in mental demand or change in environment would cause Mr. Guzman to decompensate is supported by substantial evidence. The ALJ's explanation, while brief, is sufficient to permit meaningful review when considered in the context of the opinion as a whole.[13]

### 2. Failure to Find Marked Limitations

Next, Guzman argues that the ALJ got it wrong under "paragraph B" in Step Three. The evidence, he says, actually indicates that Guzman has marked limitations or restrictions of activities of daily life, social functioning, and maintaining concentration, persistence or pace. For many of the same reasons stated above, the ALJ's determinations are supported by substantial evidence.

---

[13]  Guzman now argues that "any increase in stress" causes his condition to worsen. In support, he cites to his 2010 hospitalization, during which he reported feeling depressed that his wife lost her job and frustrated that he could not work because of his condition. (Pl.'s Br. 37., R. 286, 387) See 20 C.F.R. Pt. 404, Subpt. P, App.1, Pt. A § 12.00(c)(4) ("Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household).")

Fair enough; that is one piece of evidence weighing against the ALJ's conclusions. But the standard here is whether there was substantial evidence in support of those conclusions. Other treatment records cited by Guzman weigh against a finding that "any increase in stress" would likely cause him to decompensate. (See R. 333 (reporting that Guzman had arguments with his wife and experienced auditory hallucinations but his thought process was sequential and affect appropriate); R. 458 (reporting that Guzman had been easily stressed by performing routine tasks but he and his wife were planning to adopt a teenager); R. 464 (reporting that Guzman had been stressed by his wife's repeated divorce threats and the responsibilities of caring for his children but did not report hallucinations and had helped his sister move out of her apartment); R. 470-71 (reporting that Guzman experienced auditory hallucinations and had nearly struck his nephew but fought less with his wife and was caring for a new puppy); R. 538 (reporting that Guzman had been stressed by moving to a new house and experienced visual hallucinations but was helping the super work on his new home); R. 1665 (reporting that Guzman experienced auditory hallucinations and mild depression but had stayed busy with volunteer work)). On this record, therefore, I cannot say that the ALJ's decision that a minimal increase in mental demands or change in environment would not be predicted to cause Guzman to decompensate lacked substantial evidence.

Guzman's brief points to treatment records from 53 different dates during the relevant time period as "evidence before the ALJ" concerning Guzman's mental impairment. (Pl.'s Br. 7-22) It is true that some of these records suggest that Mr. Guzman has had some difficulty managing the symptoms of his condition, or has experienced stress, anger, anxiety, frustration, or depression. (*See, e.g.*, R. 958-59, 895-97, 538, 468-71, 465-66, 458, 377-78, 369-70, 350, 345-46, 333, 869, 1684-85, 896) Particularly troubling are several records which suggest Guzman strained, and occasionally failed, to control violent impulses of anger and aggression directed towards others. (*See, e.g.*, 286, 291, 326, 328-29, 470-71, 480)

But a number of these records suggest, contrariwise, that Mr. Guzman was able to perform daily activities, get along with others, and maintain concentration on specific tasks despite his challenging symptoms. (*See, e.g.*, R. 538, 465, 469-71, 480, 458, 538, 480-81, 369-70, 350, 345-46, 1684-85). And in still other records, Mr. Guzman denied having hallucinations, or reported that they didn't bother him or could be ignored. (*See, e.g.* R. 481; 305-306, 377, 845, 1667, 1687)

The evidence, in short, is conflicted. The ALJ's weighing of this evidence was careful, and he made specific findings to support his conclusions. Whether this court would weigh the evidence the same way is irrelevant under the applicable standard of review. Because the ALJ's findings and conclusions are supported by substantial evidence, I must sustain them.

### 3. Failure to Adequately Consider Evidence in RFC Determination

Guzman faults the ALJ for failing to adequately account for evidence of his inability to concentrate when determining his residual functional capacity. I find that the ALJ gave due consideration to all of the evidence, made findings, and gave reasons for them. His determinations are supported by substantial evidence.

I am unpersuaded by Guzman's argument that the ALJ failed to account for evidence that Guzman's auditory hallucinations, while not commands, nevertheless impair his concentration. Citing to Guzman's DIB application, the ALJ noted that Guzman stated he has difficulty maintaining concentration and focus. (R. 21, 219-226). In the same report, however, Guzman also stated that he could pay bills, handle a savings account, count change, use a checkbook, watch TV, play video games, fish, and finish activities he started. (*Id.*) Those statements are consistent with Guzman's testimony before the ALJ, where he stated that he could play a video game for at least two hours, even though his hallucinations generally affect his concentration. (R. 21, 23, 39, 61-62) As noted above, ALJ Feuer then assessed, in detail, the objective medical evidence of Guzman's impairments, which was consistent with Guzman's application statements and testimony. Based on all of those factors, the ALJ then determined Mr. Guzman's residual functional capacity. (R. 22-25)[14]

The ALJ, in other words, thoroughly discussed the evidence in the record as a whole. He credited ample evidence to the effect that Guzman's concentration is impaired. He concluded, however, that the impairment was not so debilitating as to render Mr. Guzman incapable of performing simple, routine and repetitive tasks. The ALJ had before him Mr. Guzman's treatment records and the opinion of the state's two medical consultants, who noted Mr. Guzman's moderate limitations in social functioning and maintenance of

---

[14] Here, too, the treatment records cited by Guzman fail to demonstrate that the ALJ's residual functional capacity determination lacked substantial evidence or failed to account for other pertinent evidence in the record. (*See* R. 350 (reporting that Guzman heard demeaning voices but had purchased a second dog and discussed taking college courses); 377 (reporting Guzman was able to ignore his hallucinations although they had increased in frequency and were irritating him); 465 (reporting that Guzman felt angry and frustrated but stated he wanted to go back to school and had volunteered for his church); 466-67 (reporting that Guzman heard voices but was helping to care for his father, who he planned to take to be evaluated for Alzheimer's disease); 468-69 (reporting that Guzman was anxious and paranoid but had adopted his nephew); 480 (reporting that Guzman saw shadows but was helping his adopted nephew learn English); 896 (reporting that, four months after the alleged onset date, Guzman's concentration had been moderate to severely impacted by his symptoms))

concentration. (R. 71, 82). That medical evidence supports the ALJ's conclusion that Mr. Guzman can sustain concentration, adapt to changes, and interact with others adequately.

By no means did the ALJ ignore Guzman's complaints; the formulation of Guzman's residual functional capacity clearly incorporated the social and concentration limitations that are supported by objective medical evidence. Guzman, the ALJ ruled, has the capacity to work jobs at all exertional levels (*i.e.*, he is not physically limited). His mental impairments, however, require that he be limited to occasional contact with other people and simple, routine and repetitive tasks. In sum, the ALJ's determination of the residual functional capacity took into account what Guzman says it ignored. The ALJ's residual functional capacity determination is therefore supported by substantial evidence.

### III.   CONCLUSION

For the reasons expressed above, the ALJ's decision is AFFIRMED.

Dated: September 12, 2016

_____
**KEVIN MCNULTY**
**United States District Judge**